IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

RHETT GAVIN STUART, Plaintiff,

v.

SPRINGS INDUSTRIES, INC., Defendant.

Civil Action No. 0:12-373-CMC

OPINION AND ORDER
ON MOTION TO DISMISS

Through this action, Plaintiff, Rhett Gavin Stuart ("Stuart"), seeks recovery for injuries he sustained in a forklift rollover accident. At the time of the accident, July 9, 2010, the forklift was owned by Stuart's employer, the City of Lancaster, South Carolina ("City"). The forklift was previously owned by Defendant, Springs Industries, Inc. ("Springs"), but was transferred to the City as part of a larger transfer of a mill and its contents in 2005. Stuart seeks to hold Springs responsible for his injuries based on Springs' prior ownership and possible modification of the forklift combined with Springs' failure to warn the City of dangers posed by the forklift when Springs transferred the mill and its contents to the City.

The matter is before the court on Springs' motion for summary judgment. For the reasons set forth below, the motion is granted in full, though not on all grounds argued.

**STANDARD**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from

those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Rule 56(c)(1) provides as follows:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers or other materials; or
>
> (b) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## FACTS

Taken in the light most favorable to Stuart, the nonmoving party, the facts are as follows.

**Transfer of Forklift.** Representatives of both the City and Springs have submitted affidavits characterizing the transfer of the mill and its contents as a donation to the City. Ron Lardo Affidavit ¶¶ 3-4 (Dkt. No. 46-1 at 1); Steve Willis Affidavit ¶¶ 3-4 (Dkt No. 46-2 at 1). The same affidavits

reveal that the transaction was structured as a sale for a token sum ($10), with the City to use or dispose of the contents of the mill as the City saw fit.

In his affidavit, Springs' representative explains as follows:

> 8. The purpose of the donation was to provide a building the City of Lancaster could occupy for public use, as a training facility for city employees or a 911 dispatch center.
>
> 9. The City of Lancaster was to use desks, chairs, and space that it could and dispose of any other items remaining in the facility.
>
> 10. Although transfer of a forklift was not specifically contemplated in the property donation, any equipment or other items within the building, to include the forklift, were left in the building for the City of Lancaster to dispose of as it saw fit as part of its preparing of the building for use to benefit the City of Lancaster.

Lardo aff. ¶¶ 8-10. The City's representative offers the same explanation:

> 7. The City of Lancaster was to use desks, chairs, and space that it could and dispose of any other items remaining in the facility, whatever those items might be.
>
> 8. Although transfer of a forklift was not specifically contemplated in the property donation, any equipment or other items within the building, to include the forklift, were left in the building for the City of Lancaster to dispose of as it saw fit as part of its preparing the building for use to benefit the City of Lancaster.

Willis aff. ¶¶ 7,8.

Both Springs and Stuart rely on the above affidavits. Stuart also relies on affidavits of Helen Sowell and Tim Harper, respectively the City's Administrator and Risk Manager (both at the time of the accident and when the affidavits were prepared).[1] Neither of these City representatives challenges the characterization of the purpose or nature of the transfer of assets as indicated in the

---

[1] For purposes of this order, the court assumes without deciding that the affidavits attached to Stuart's opposition memorandum, including the expanded opinions of his expert, may properly be considered in opposition to Springs' motion. Because Stuart's claims fail even with this assumption, the court need not address Springs' challenge to consideration of these affidavits.

Lardo and Willis affidavits. Instead, both refer only generically to the fact that the forklift was transferred to the City by Springs.[2]

Neither Harper nor Sowell indicate that they ever examined the forklift, or suggest any reason why the absence of a seatbelt or other driver restraint system would not have been obvious had they done so. Nonetheless, both aver that, had they been aware that the forklift lacked seatbelts or some other "operator restraint system," they would have taken action either to correct the hazard or preclude use of the forklift.[3]

For example, Sowell avers that, prior to the accident, she "was not aware that the lift truck given to the City by Springs Industries was not equipped with seat belts." Sowell aff. ¶ 7. Despite conceding that she lacks "any knowledge as to what the City may have been told by Springs Industries about the contents of the building[,]" Sowell avers as follows:

> If Springs Industries had warned the City of Lancaster that the lift truck was not equipped with Seat Belts, otherwise contained any recognized hazard or other unusual risk of injury, *or* that its operation was an OSHA violation, I would have personally ensured that the hazard was corrected or that the lift truck was locked away from potential use by employees or others.

*Id.* ¶ 9 (emphasis added).

Harper' affidavit is essentially the same, except for using the term "operator restraint system" rather than "Seat Belts." He avers that he was unaware that the forklift lacked "an operator restraint system," and states he is not aware of any warnings by Springs regarding the safety of the forklift.

---

[2] Both affidavits state that the forklift "was included in a significant amount of property that was owned by Springs but was left in the Springs facility when the facility was transferred to the City[.]" Sowell aff. ¶ 4; Harper aff. ¶ 4. Neither addresses the nature of the transfer.

[3] "Operator restraint system" is a term that encompasses but is not limited to seatbelts. *See* Harper aff. ¶ 6 (indicating the City used a different form of operator restraint system on its one other forklift, "an enclosed cage surrounding the operator which would restrain the operator in the event of a rollover.").

Harper aff. ¶¶ 7, 8. In language virtually identical to Sowell's, Harper asserts that he would have taken corrective action had he been aware of the absence of an operator restraint system. *Id.* ¶ 9.

**Stuart's Use of the Forklift.** Stuart first saw the forklift being operated one or two months before he used it and first used it roughly three weeks before his accident. Stuart dep. at 82. Stuart operated the forklift several times before the day of his accident. *Id.* (indicating he operated the forklift at least a couple of times before the accident); *id.* at 93-94 (agreeing he operated the forklift at least three and possibly five or six times before the accident).

Before he first used the forklift, Stuart observed that it did not have a seatbelt. *Id.* at 89. Because of his prior training in forklift operation, he was aware that the absence of a seatbelt posed a danger. *Id.* at 16, 55-57 (referring to training), 89-91 (stating he observed that there was no seatbelt and recognized that this posed a danger, including of falling off the forklift). Stuart decided to operate the forklift despite his knowledge of the danger posed by the absence of a seat belt. *Id.* at 91; *see also id*. at 95 (conceding that, each time he used the forklift, he observed that there was no seatbelt and realized this posed a danger).

At some point, Stuart mentioned the need for seatbelts to some other City employee. *Id.* at 95 (noting he "made mention . . . that it needed proper safety equipment" and agreeing he "told somebody at [his] job that it needed a seatbelt"). The record does not, however, identify the person to whom the statement was made or indicate whether they were in a supervisory position.

Stuart conceded that no further warning would have made a difference with respect to his decision to use the forklift:

> Q. If someone said to you, "You could fall off this forklift because it does not have a seat belt," that's something you already knew, correct?
>
> A. From, yeah, my training, yes.

Q. If someone said to you, "You could be thrown from this forklift if it starts to fall because it does not have a seat belt," that's something you already knew, correct?

A. That's correct.

Q. Is there a warning that someone could have given you about the lack of seat belt that would've made you know any more about the dangers that it posed? [objection to form]

A. Probably not.

Stuart dep. at 96-97. Stuart also agreed that the absence of a seatbelt was obvious and not a hidden danger. *Id.* at 97.

**Stuart's Accident.** On the day of Stuart's accident, he and another firefighter were sent to the mill by the City Administrator, Helen Sowell, to help load tables that a private party had purchased from the City as surplus. *Id.* at 72-73 (noting individual had purchased through govdeals.com). Due to the size of the tables, Stuart and his co-worker decided to use the forklift. *Id.* at 75-76, 100 (noting the keys were in the forklift and conceding he volunteered to operate the forklift even though he knew it lacked a seatbelt and understood the danger posed by this deficiency).

The accident occurred outside the building in the parking lot, after the brakes failed.[4] *Id.* at 101-02. Stuart was initially able to stop the forklift despite the brake failure, but it began rolling again slowly. *Id.* at 102-03 (describing the movement as "creeping"). Due to the slope of the parking lot, the forklift began to pick up speed. As it did, Stuart tried several maneuvers to stop the forklift. *Id.* at 104-06. These maneuvers proved unsuccessful and the forklift ultimately became

---

[4] Stuart does not seek to hold Springs responsible for the brake failure and would not, in any event, be able to do so as he concedes the City had worked on the brakes before his accident. His claims, instead, rest of the absence of seatbelts or other operator restraint system and Springs' possible responsibility for modifications to the forklift's roll over protection system (discussed *infra*).

airborne, flipped, and pinned Stuart's legs under the roll cage. *Id.* at 106-09. The forklift then slid for some distance with Stuart's legs pinned under the roll cage. *Id.* Stuart suffered substantial injuries as a result of the accident. *E.g., id.* at 110-14.

**Roll Over Protection System ("ROPS").** Stuart asserts in his opposition memorandum that the Roll Over Protection System ("ROPS") (also referred to as an "overhead guard") that was on the forklift when it was transferred to the City "was manufactured and affixed to the forklift by Springs Industries or at its direction." Dkt. No. 51 at 3 ¶ 3. This assertion is not, however, supported by the cited evidence which consists of an affidavit of Stuart's expert, Bryan R. Durig, Ph.D., P.E. Neither is it supported by Durig's attached expert report.[5]

In his expert report, Durig states that the forklift was originally sold with a ROPS and without seatbelts. Report at 3-4. He also states that the original sale, in 1966, was to an entity other than Springs. *Id.* Durig opines that the ROPS in place at the time of Stuart's accident was not the same as originally installed because of certain differences between the design shown in the manufacturer's manual and the ROPS actually affixed to the forklift. Report at 5 (noting two differences: the use of round steel tubing rather than rectangular steel tubing; and welds rather than or in addition to bolts as an attachment method). Based on these differences, Durig opines that "Springs Industries *or one of its predecessors* replaced the original [manufacturer's] overhead guard." Report at 5 (emphasis added); *see also id.* at 6 (repeating in summary that Springs "or one of its predecessors" replaced the overhead guard).

Neither Durig's report nor any other proffered evidence addresses whether or how Stuart's

---

[5] Stuart cites "Durig Aff. pp. 3, 15-17[.]" The affidavit has both a page 3 and a paragraph 3, but neither pages nor paragraphs 15-17. The attached expert report also lacks pages or paragraphs 15-17. It is not, therefore, clear what portions of either document Stuart meant to cite. The court has, nonetheless, reviewed the affidavit and expert report in full.

injuries were caused or exacerbated by the ROPS design differences noted in Durig's report (round vs. rectangular steel tubing and welds in lieu or in addition to bolts). Instead, the concern noted in Durig's report is the presence of *any* overhead guard without also including a seatbelt. *Id.* at 4-5. As Durig explains:

> Many forklift safety articles discuss the hazards associated with the overhead guard but no seatbelt where operators try to jump off a side tipping forklift but get crushed by the forklift or overhead guard. Forklift operators are much safer if restrained inside the frame/guard of the forklift. In Mr. Stuart's accident, since he was not restrained by any device, he was crushed by the forklift [when] he fell out of the seat during the side tipover. Had Mr. Stuart [been] properly restrained in the operator's seat, he would not have been crushed by the forklift.

*Id.*

**Seatbelts.** In his expert report, Durig notes that the manufacturer of the forklift developed a seatbelt for forklifts in 1983 and began offering a free seatbelt retrofit program at some point thereafter (apparently in or after 1993). That program ended in 2004 (before the transfer of the mill and contents to the City). *Id.* at 4. Durig also notes that OSHA began requiring seatbelts (or other operator restraint systems) on forklifts in 1996. *Id.* Based on these assertions, and the fact no seatbelt was in place when Stuart was injured, Durig opines that the forklift "was used by Springs Industries with an overhead guard but without a seatbelt." *Id*. He also opines that: "[i]t does not appear that Springs Industries took advantage of the free seatbelt retrofit program offered by [the manufacturer] prior to giving the subject forklift to the City of Lancaster." *Id.* at 4.

Durig concludes his report with the following summary of his opinion regarding the absence of seatbelts:

> [Springs] failed to have a seatbelt installed even though the forklift had an overhead guard. . . . Springs Industries should have been aware of the OSHA and ANSI requirements for operator restraint systems. The subject [forklift] was in a defective condition when Springs Industries gave the subject forklift with an overhead guard but no seatbelt to the City of Lancaster.

Report at 6.

## PRIOR PROCEEDINGS

Shortly after this action was filed, Springs moved to dismiss Stuart's then-single negligence claim arguing, *inter alia*, that it owed no duty to Stuart because the forklift was part of a donation of property to the City. Dkt. No. 8. After initial briefing, the court requested additional "briefing on the applicability of Restatement (Second) of Torts Sections 388 [and] 405[.]" Dkt. No. 21. The court also allowed Stuart to amend his complaint to clarify whether (and if so on what factual basis) he was asserting a failure to warn claim. *Id.* (indicating motion to dismiss would be deemed to survive the amendment). Stuart subsequently filed a second amended complaint, adding an express claim for negligent failure to warn. Dkt. Nos. 27. After receiving the parties' supplemental briefs, the court denied Springs' motion to dismiss. Dkt. No. 33.

As explained in the order denying Springs' motion to dismiss, Stuart's first negligence claim alleges that Springs was negligent in (1) failing to retrofit the forklift with a seatbelt despite the manufacturer's recommendation and related offer to complete retrofitting; (2) making the forklift more dangerous by adding a ROPS without adding a seatbelt, and (3) donating the forklift to the City without correcting this dangerous condition. Stuart's second negligence claim rests on Spring's failure to warn Stuart or the City of the dangerous condition, specifically, the absence of a seatbelt. Dkt. No. 33 at 2-3.

In denying Springs' motion to dismiss, the court considered the possibility that Springs owed Stuart a duty under Section 388 of the Restatement (Second) of Torts, which had been adopted by South Carolina. *See id.* at 4-5. Faced with competing arguments as to whether South Carolina would apply Section 388 to donors, the court held that this was "an important and novel question"

and, therefore, "decline[d] to decide [the question] on motion to dismiss, particularly as the proper resolution may be clarified by further development of the facts." Dkt. No. 33 at 4 (citing *Unysis Corp. v. South Carolina Budget and Control Bd. Div. of Gen. Servs.*, 551 S.E.2d 263 (S.C. 2001) (noting that, "[a]s a general rule, important questions of novel impression should not be decided on a motion to dismiss" unless development of the record will not aid in the resolution of the issues)).

The court also rejected Springs' argument that Stuart's Section 388 claim would fail as a matter of law based on an absence of evidence necessary to support findings in Stuart's favor on the criteria listed in subparagraphs (a) through (c) of Section 388. In rejecting this argument, the court noted that "South Carolina and other states appear to treat subparts (a)-(c) of Section 388 as an affirmative defense." *Id.* at 5 (citing *Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321, 332 (S.C. Ct. App. 1996) (referring to these subparts as a "sophisticated user *defense*" and noting that this "*defense* has been adopted by numerous jurisdictions") (emphasis added)). Based on the South Carolina courts' prior treatment of subparagraphs (a) through (c), the court assumed for purposes of the motion to dismiss that the burden of pleading and proving this "defense" rested on Springs. The court also noted that "Springs' arguments rest, at least in part, on facts which are not in the record" and, therefore, concluded that "application of Section 388 should not be resolved on motion to dismiss."[6] The court also declined to find that Stuart's "negligence claim fail[ed] as a matter of law to the extent founded on allegations that Springs *created* the risk by modifying the forklift to include a ROPS without also adding a seatbelt." Dkt. No. 33 at 5.

Discovery proceeded after denial of Springs' motion to dismiss, including through two

---

[6] For reasons explained below, the court now concludes that, to the extent a party relies on Section 388 as the *basis for imposing a duty of care,* that party has the burden of proving facts to support subparagraphs (a)-(c).

extensions of the discovery deadline. Dkt. Nos. 38, 45. Springs filed its motion for summary judgment roughly three weeks before the close of discovery. Dkt. No. 46. Stuart was, however, given an extension of time to respond to the motion until after the close of discovery. Dkt. Nos. 49, 50. The motion for summary judgment, therefore, rests on a fully developed record.

**DISCUSSION**

Springs seeks summary judgment on multiple grounds. For reasons explained below, the court finds two grounds dispositive, making it unnecessary to reach Springs' other arguments. Specifically, the court concludes that: (1) Stuart has failed to proffer evidence that Springs installed or modified the ROPS or that any modification to the ROPS increased the risk of harm, thus precluding liability based on a theory that Springs created the risk of harm; and (2) Stuart has also failed to proffer evidence sufficient to impose a duty based Restatement Section 388, even assuming that section applies to donors. Stuart's claims, therefore, fail because he has not proffered evidence that Springs owed him a duty of care, the breach of which could have caused or exacerbated his injuries.

**I. Absence of Evidence that Springs Created the Risk of Harm**

In denying Springs' motion to dismiss, the court noted two possible grounds on which a duty of care might be imposed on Springs. One was the possibility Springs had "*created* the risk by modifying the forklift to include a ROPS without also adding a seatbelt." Dkt No. 33 at 5 (emphasis in original ). The court explained that it could not "conclude as a matter of law that Springs' alleged creation of the risk is not enough to present special circumstances allowing imposition of a duty of due care." *Id.* (citing *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.*, 644 S.E.2d 43 (S.C. 2007) (listing five recognized bases for imposing a duty of due care but noting that the law "will not

extend the concept of a legal duty of care in tort law beyond reasonable limits")).

As the matter is now before the court on motion for summary judgment, the court considers whether Stuart has adduced evidence which might support this basis for imposing a duty. His own expert's report confirms that he has not.

Stuart relies on the affidavit and expert report of Durig in support of his claim that Springs created the risk of harm. This reliance is misplaced as Durig concedes that the forklift was originally sold with a ROPS and without a seatbelt. Durig further concedes that the sale, in 1966, was to an entity other than Springs.[7] Durig also notes that seatbelts were not available until substantially later (1983 at the earliest). It follows that the risk of harm posed by having a ROPS without a seatbelt (or other operator restraint system) was not *created* by Springs. Instead, it was created by the original manufacturer.

This leaves the possibility that Springs modified the ROPS in a manner which made it more dangerous. Again, Stuart fails to proffer evidence which would make this more than a speculative possibility. While Durig refers to evidence that the ROPS may have been modified (or at least repaired) at some point during the nearly fifty years between when it was sold to Springs' predecessor in 1966 and when Springs transferred the forklift to the City in 2005, he does not suggest any basis for concluding that these possible modifications were made by Springs. Stuart offers no other basis for attributing the modifications, if any, to Springs, leaving unsupported the basic premise that Springs made modifications.

Even if there was evidence that Springs made modifications, there is no evidence that the modifications identified by Durig (use of round instead of rectangular tubing and welds instead of

---

[7] The record remains unclear as to when or how the forklift came into Springs' possession.

or in addition to bolts) created or increased any risk of harm, much less the particular harm that Stuart suffered. Instead, it is clear from Durig's report that the risk of harm was the risk posed by the presence of any ROPS without a corresponding operator restraint system such as a seatbelt. As noted above, that risk was present from the time of the original sale of the forklift to Springs' predecessor.

In sum, there is no evidence that Springs modified the forklift or that any modifications (regardless of who made them) caused or increased Stuart's injury. Springs is, therefore, entitled to summary judgment to the extent either of Stuart's claims rests on a theory that Springs owed a duty of care to Stuart because Springs created or increased the risk of harm.

**II. Restatement Section 388**

The other possible basis for imposing a duty on Springs rests on Section 388 of the Restatement (Second) of Torts. For present purposes, the court will assume without deciding that the South Carolina Supreme Court would apply Section 388 to a donor. Section 388 reads as follows:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, *if the supplier*
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) *has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition*, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388 (emphasis added).

The first issue the court must address is whether the party invoking this section as a basis for imposing a duty or the party opposing imposition of the duty bears the burden of proof as to the three subparagraphs. For purposes of the order denying Springs' motion to dismiss, the court assumed that the burden rested on Springs because "South Carolina and other states appear to treat subparts (a)-(c) of Section 388 as an affirmative defense." Dkt. No. 33 at 5 (citing *Bragg v. Hi-Ranger, Inc.,* 462 S.E.2d 321 (S.C. Ct. App. 1996)).

The court now concludes, however, that where Section 388 provides the *sole* basis for imposing a duty, the burden of proving that all elements (including the three subparagraphs) are satisfied rests on the party seeking to impose the duty. This determination rests primarily on the use of "if" preceding the three subparagraphs. That word choice suggests an intent to require proof of the circumstances which precede the word "if," as well as those which follow, in order to impose a duty based on Section 388. Had the drafters intended the initial clause to impose a duty, with the three subparagraphs acting only as a defense, they would have used a word such as "unless" as the connector.

The South Carolina Court of Appeal's decision in *Bragg* and cases cited in that opinion do not suggest a different result. This is because the duty at issue in those cases did not arise solely from Section 388. Instead, *Bragg* and the cases it cites involved typical products liability claims, with the duty arising from the defendants' role in manufacturing or selling the product.[8] Under these

---

[8] The nature of the claims at issue in cases cited in *Bragg* is apparent from the following discussion:

> We conclude the trial court properly charged the jury concerning the

(continued...)

circumstances, treating the listed criteria as a defense (that is, as if preceded by the word "unless") is a logical adaptation of Section 388 because the duty does not arise from Section 388.

Section 388(b), therefore, requires Stuart to establish that Springs had "no reason to believe that those for whose use the chattel [was] supplied [would] realize its dangerous condition." Section 388(b). As explained in Durig's affidavit and report, the "dangerous condition" was the absence of a seatbelt, particularly coupled with the presence of a ROPS. Both the absence of the seatbelt and

---

[8](...continued)
sophisticated user defense. The sophisticated user defense outlined in section 388 of the Restatement (Second) of Torts has been adopted by numerous jurisdictions. *See Willis v. Raymark Indus., Inc.*, 905 F.2d 793 (4th Cir. 1990) (the sophisticated user defense may be permitted in cases involving an employer who is aware of the inherent dangers of a product which the employer purchases for use in its business; if the employer/purchaser has "equal knowledge" of the product's dangers, then the *manufacturer* may be able to rely on the employer/purchaser to protect its own employees from harm); *see also Goodbar v. Whitehead Bros*., 591 F. Supp. 552 (W.D. Va.1984), *aff'' sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985) (in failure to warn case brought by employees of foundry suffering from silicosis, the court found that because *supplier* had reason to believe that the knowledgeable industrial purchaser of the product (the foundry) would recognize the dangers associated with the product, the supplier's reliance on the foundry to warn and protect the workers was reasonable, and the supplier was not mandated to give warnings directly to the employees).

In *O'Neal v. Celanese Corp*., 10 F.3d 249 (4th Cir. 1993), the Fourth Circuit Court of Appeals, applying Maryland law, upheld the district court's grant of judgment notwithstanding the verdict in favor of an *equipment seller* based upon the sophisticated user defense. In defining the sophisticated user defense, the court explained, "it is not the specific knowledge of the intermediary that is relevant. Rather, the question is whether the supplier, Celanese, acted reasonably in assuming that the intermediary would recognize the danger and take precautions to protect its employees." The court concluded the supplier was reasonable in relying on the employer to warn its employees since the employer was an experienced operator in the salvage business who knew or should have known that the red-orange paint applied to the plant equipment was an indication of lead paint.

*Bragg*, 462 S.E.2d at 332 (footnotes omitted) (emphasis added).

presence of the ROPS were, however, readily apparent to any observer.[9]

For present purposes, the court will assume that the belief addressed by Section 388(b) refers not only to a belief regarding the condition itself (absence of a seatbelt coupled with the presence of a ROPS), but also regarding whether the condition is dangerous. Thus, the court assumes Stuart could still satisfy his burden by establishing that Springs did not have reason to believe that those for whose use the forklift was supplied would realize that absence of a seatbelt, particularly coupled with a ROPS, constituted a dangerous condition.

Stuart has proffered no evidence which might support such a conclusion. To the contrary, his proffered evidence confirms that responsible City officials, and he himself, understood that absence of a seatbelt presented a danger. Most critically, both Sowell and Harper averred that they "would have ensured . . . that the hazard was corrected or that the lift truck was locked away from potential use by employees or others" if they had been warned that the "lift truck was not equipped with an [operator restraint system or seatbelts,]" Harper aff. ¶ 9 (using the term "operator restraint system"); Sowell aff. ¶ 9 (using the term "Seat Belts").

The safety regulations on which Durig relies in his report to suggest that Springs owed a duty of care (*e.g.,* OSHA regulations) also preclude a finding in Stuart's favor on this point, at least absent evidence that these regulations were inapplicable to the City. Stuart has not presented any authority for the implicit premises that (1) the City was not obligated to comply with these regulations or (2) Springs would not have assumed the City would do so – at least to the extent of correcting an

---

[9] The situation could be different if the defect was not readily apparent and Springs was aware of but failed to disclose the *hidden* danger. For example, if the seatbelt was present but had a latch which tended to spring open, and Springs was aware of this defect, it might have had a duty to disclose the problem.

obvious safety deficiency prior to using the abandoned property.[10]

Even if the court were to place the burden of proof on Springs, it would find the evidence relating to Section 388(b) precludes imposing any duty on Springs. It is beyond dispute (from Stuart's own testimony) that the absence of a seatbelt was obvious. It is also beyond dispute that the relevant safety regulations were applicable to the City.[11] Even without these regulations, the affidavits of Sowell and Harper establish beyond dispute that two City officials who were responsible for and able to control such matters understood that a missing seatbelt posed a serious risk to safety. (They lacked only knowledge of the existence of the defect which would have been obvious from a cursory, visual inspection of the forklift.) Absent some contrary evidence, and none is offered, this combination of factors (the obviousness both of the deficiency and the danger posed), precludes a finding that Springs "had no reason to believe that [the City would] realize [the forklift's] dangerous condition." Section 388(b).

For the reasons set forth above, Springs is entitled to summary judgment to the extent Stuart relies on Section 388 to impose a duty on Springs. This exhausts the two possible bases for imposing a duty on Springs under either of Stuart's causes of action.

---

[10] To the extent Stuart relies on evidence that Springs owned more forklifts and had a more developed safety program than did the City, his reliance is misplaced as neither fact supports the implicit premise that Springs would not have believed the City would comply with applicable safety regulations.

[11] The City was, in fact, cited with a safety violation by the South Carolina Department of Labor, Licensing and Regulation after Stuart's accident for "failing to furnish a place of employment which is free of recognized hazards which may cause death or serious physical harm to its employees." Harper aff. ¶ 5. The citation notes that the "employer knew or should have known that employees operating a Clark forklift, model CF20, without wearing a seatbelt [were] exposed to a tipover hazard and being crushed. A feasible and useful means of abatement, among others, is to install a seatbelt and ensure that employees are wearing it." Dkt. No. 51-7 at 7.

## CONCLUSION

The motion for summary judgment filed by Defendant, Springs Industries, Inc., is granted for the reasons set forth above. The court expresses no opinion on any additional grounds advanced in favor of summary judgment . This resolves all claims in this action.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
July 12, 2013